Calvin Jerold BURDINE,
Petitioner–Appellee,

v.

Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellant.

No. 99–21034.

United States Court of Appeals,
Fifth Circuit.

Oct. 27, 2000.

Robert Lee McGlasson, II (argued), Decatur, GA, Mandy Welch, Burr & Welch, Houston, TX, for Petitioner–Appellee.

Julie Caruthers Parsley (argued), Edward Larry Marshall, Austin, TX, for Respondent–Appellant.

Before JONES, BARKSDALE and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The linchpin to this appeal is whether, under the Sixth Amendment, prejudice must be *presumed* when appointed defense counsel sleeps during *unidentified* portions of a capital murder trial. The State contests the district court's application of that presumption in granting habeas relief to Calvin Jerold Burdine, convicted for capital murder and sentenced to death in Texas. We VACATE and REMAND.

## I.

Burdine's January 1984 conviction and sentence were for the 1983 robbery and murder of Wise. Burdine was represented at trial—and, *at his request,* on direct appeal—by court-appointed counsel, Joe Cannon. The trial evidence included a police officer's testimony that Burdine, while in custody in California following his arrest ten days after the murder, confessed that, after unsuccessfully trying to smother and then beat Wise to death, McCreight, Burdine's 17–year–old companion, stabbed Wise, and then Burdine did so.

Cannon's theory of defense was: Burdine did *not* intend to kill Wise; McCreight was the instigator of the robbery and murder. Cannon sought to portray Burdine, who, at the time of the murder, had *not* completely recovered from surgery in which a lung had been removed, as too weak to have participated in the murder and as a victim of Wise, an older man who took advantage of him. (Burdine and Wise had had a homosexual relationship.)

Burdine testified at the guilt-innocence phase of trial, admitting his participation in the robbery, but denying he stabbed Wise. At the punishment phase, outside the presence of the jury *and against Cannon's advice,* Burdine declined to testify. Immediately thereafter, in the presence of the jury, Cannon asked Burdine if he wished "to take the stand and plead for [his] life". Before being interrupted by the trial judge, Burdine responded to Cannon: "No, sir, they didn't listen to me the first time, I don't see—".

On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence. *Burdine v. State,* 719 S.W.2d 309 (Tex.Crim.App.1986). The Supreme Court denied certiorari in March 1987. *Burdine v. Texas,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987).

Represented by new counsel, Burdine filed his first state habeas application in July 1987, asserting, *inter alia,* numerous bases for ineffective assistance of counsel. A supplemental application was filed in March 1988. That September, the state trial court conducted a three-day evidentiary hearing. Six years later, in June 1994, the trial court recommended relief being denied. *Ex parte Burdine,* Cause No. 37944–A (183rd Dist. Ct. Harris County, Texas, 29 June 1994). Accepting that recommendation, the Texas Court of Criminal Appeals denied relief that December. *Ex parte Burdine,* Writ No. 16,725–02 (Tex.Crim.App. 12 Dec. 1994).

Burdine filed a second state habeas application later that month, nearly 11 years after trial, *claiming for the first time* denial of assistance of counsel because Cannon repeatedly dozed and/or slept at trial. The state trial court conducted an evidentiary hearing in February 1995. That April, it recommended relief being *granted,* finding that Cannon slept during portions of the trial, and concluding that such conduct was presumptively prejudicial. *Ex parte Burdine,* Cause No. 37944–B (183rd Dist. Ct. Harris County, Texas, 3 April 1995). But, the Texas Court of Criminal Appeals *denied relief,* holding that, although the trial court's findings of fact were supported by the record, Burdine was *not* entitled to relief because he had *not* demonstrated prejudice. *Ex parte Burdine,* 901 S.W.2d 456 (Tex.Crim.App.), *cert. denied,* 515 U.S. 1107, 115 S.Ct. 2256, 132 L.Ed.2d 263 (1995).

Later that same month, April 1995, Burdine sought federal habeas relief, presenting ten claims. They included numerous alleged instances of ineffective assistance of counsel, as well as the claim that prejudice should be *presumed* because Cannon slept during *substantial portions* of a *critical stage* of trial. In September 1999, the district court granted relief on the prejudice presumed for sleeping during trial claim, without addressing the remaining claims. *Burdine v. Johnson,* 66 F.Supp.2d 854 (S.D.Tex.1999).

## II.

For the two-prong test for ineffective assistance of counsel *vel non* (deficient performance and resulting prejudice), the State concedes the correctness of the state habeas court's factual finding that Cannon slept during trial, thereby rendering deficient performance. But, it challenges presuming prejudice, because, under the circumstances of this case, that constitutes a "new rule", *not* available to Burdine on collateral review. Alternatively, it maintains that the presumption is inapplicable in a case such as this, involving deficient performance within an otherwise adversarial trial. It contends also that the district court erred by failing to apply harmless error analysis. (The State's contention that the judgment is erroneous if interpreted to bar retrial is moot; the order has *not* been so interpreted.)

■ "In considering a claim for federal habeas relief, we review the district court's factual findings for clear error and its legal conclusions *de novo.*" *Childress v. Johnson*, 103 F.3d 1221, 1224 (5th Cir.1997). Because Burdine filed his federal application prior to enactment of the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), its standards for reviewing the state court's decision are *not* applicable. *E.g., Perillo v. Johnson*, 205 F.3d 775, 793 (5th Cir.2000). "When applying the pre-AEDPA standard to ineffective assistance of counsel claims, this Court has held that whether counsel was deficient, and whether the deficiency, if any, prejudiced the petitioner ... are legal conclusions which both the district court and this Court review de novo." *Moore v. Johnson*, 194 F.3d 586, 603–04 (5th Cir.1999).

■ On the other hand, "[t]he state court's subsidiary findings of specific historical facts and state court credibility determinations are ... entitled to a presumption of correctness under [pre-AEDPA] § 2254(d)". *Id.* at 604. Therefore, as the State concedes, we are bound by the state habeas court's finding that Cannon slept during trial, even though he testified at the state habeas evidentiary hearing that he had *not* slept; that, instead, he often kept his eyes closed and might nod his head while thinking or concentrating, and that it was possible for someone observing him to think he was sleeping.

■ Whether the nonretroactivity principle of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), precludes Burdine from benefitting from the claimed prejudice-presumption is a question of law reviewed *de novo.* See *United States v. Shunk*, 113 F.3d 31, 34 (5th Cir. 1997) (§ 2255).

### A.

According to Burdine, Cannon's repeated sleeping, for significant periods of time, constituted a constructive denial of assistance of counsel at a critical stage of the proceedings, requiring presuming prejudice. The State contends that Burdine seeks the benefit of a *new rule, not* in effect when his conviction became final, which, under *Teague* and its progeny, is *not* available to him retroactively.

■ *Teague*'s retroactivity principle "*prevents* a federal court from granting habeas relief to a state prisoner based on a rule announced after his conviction and sentence became final", unless certain narrow exceptions apply. *Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (emphasis in original). "In determining whether a state prisoner is entitled to habeas relief, a federal court should apply *Teague* by proceeding in three steps." *Id.* at 390, 114 S.Ct. 948.

First, we must determine when [Burdine's] conviction and sentence became final for *Teague* purposes.... Second, we must "survey the legal landscape as it then existed and determine whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by exist-

ing precedent to conclude that the rule he seeks was required by the Constitution." ... Third, if we determine that [Burdine] seeks the benefit of a new rule, we must consider whether "that rule falls within ... the ... narrow exceptions to the nonretroactivity principle."

*Fisher v. Texas,* 169 F.3d 295, 305 (5th Cir.1999) (quoting *Caspari,* 510 U.S. at 390, 114 S.Ct. 948).

### 1.

■ Burdine's conviction became final in 1987, when the Supreme Court denied certiorari. With respect to the second *Teague* step, "[u]nless reasonable jurists hearing [Burdine's] claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, we are barred from doing so now". *Fisher,* 169 F.3d at 305 (internal quotation marks and citation omitted).

In 1932, the Supreme Court held that a capital defendant has a constitutional right to "the guiding hand of counsel at every step in the proceedings against him". *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). In this regard, the Court held subsequently that showing prejudice was *not* necessary when the defendant was denied counsel at arraignment, a critical stage of the proceedings, because certain defenses were lost if *not* then pled. *Hamilton v. Alabama,* 368 U.S. 52, 53–55, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961). Similarly, a defendant was denied assistance of counsel when the trial judge, pursuant to state statute, denied defense counsel the opportunity to be heard in summation at a bench trial, despite the fact there was no way to know whether argument might have affected the outcome of trial. *Herring v. New York,* 422 U.S. 853, 864–65, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). And, shortly thereafter, the Court reversed a decision that defendant's failure to claim prejudice was fatal to his Sixth Amendment claim, and concluded that a court order preventing him from consult-

ing with his counsel during a 17–hour overnight recess between defendant's direct and cross-examination deprived him of assistance of counsel. *Geders v. United States,* 425 U.S. 80, 82, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

■■ The well-known standards for ineffective assistance claims were established in 1984 in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Under *Strickland,* "the defendant must show that counsel's performance was deficient"—"counsel made errors so serious [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment". *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. In addition, the defendant "must show that the deficient performance prejudiced the defense"—"counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable". *Id.* For this prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

*Strickland* observed that, "[i]n certain Sixth Amendment contexts, *prejudice is presumed*". *Id.* at 692, 104 S.Ct. 2052 (emphasis added). Such contexts were described as "[a]ctual or constructive denial of the assistance of counsel altogether" and "various kinds of state interference with counsel's assistance". *Id.* "Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Id.* "[S]uch circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent". *Id.* "[A] similar, though more limited, presumption of prej-

udice" applies "when counsel is burdened by an actual conflict of interest". *Id.*

*Cronic,* decided the same day as *Strickland,* held a presumption of prejudice unwarranted under the circumstances of that case (young lawyer with real estate practice appointed to represent defendant and allowed only 25 days for pretrial preparation in complex mail fraud prosecution). *Cronic,* 466 U.S. at 666, 104 S.Ct. 2039. But, as it had in *Strickland,* the Court observed "[t]here are . . . circumstances . . . so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified". *Cronic,* 466 U.S. at 658, 104 S.Ct. 2039. Such circumstances include: (1) "the complete denial of counsel", *id.* at 659, 104 S.Ct. 2039; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing", *id.;* (3) "when counsel was either totally absent, or prevented from assisting the accused during a *critical stage* of the proceeding", *id.* at 659 n. 25, 104 S.Ct. 2039 (citing, *inter alia, Geders, Herring,* and *Hamilton* ; emphasis added); and (4) "when counsel labors under an actual conflict of interest", *id.* at 662 n. 31, 104 S.Ct. 2039. But, "[a]part from circumstances of that magnitude, . . . there is generally *no* basis for finding a Sixth Amendment violation unless the accused can show how *specific errors of counsel* undermined the reliability of the finding of guilt". *Id.* at 659 n. 26, 104 S.Ct. 2039 (emphasis added).

Burdine contends that the third circumstance (absent during critical stage) described in *Cronic,* and cases cited therein, such as *Geders, Herring,* and *Hamilton,* dictated the result reached by the district court here, because each involved the denial of assistance of counsel at a single "critical stage" of the proceedings, rather than the complete denial of assistance of counsel during an entire trial. Burdine maintains that a sole defense counsel's pattern of repeatedly sleeping for a significant amount of time during both phases of a capital murder trial unquestionably amounts to the denial of assistance of counsel during such a stage of trial.

*Geders, Herring,* and *Hamilton* did *not* involve circumstances analogous to Burdine's. Instead, in each, the government was responsible for the denial of counsel. *See Geders,* 425 U.S. at 82, 96 S.Ct. 1330 (court order); *Herring,* 422 U.S. at 864–65, 95 S.Ct. 2550 (state statute); *Hamilton,* 368 U.S. at 53, 82 S.Ct. 157 (no counsel appointed for arraignment). Obviously, the State was *not* responsible for Cannon's sleeping; indeed, the trial judge and prosecutor testified at the state evidentiary hearing that they did *not* observe him doing so.

Of course, "[t]he fact that the accused can attribute a deficiency in his representation to a source external to trial counsel does not make it any more or less likely that he received the type of trial envisioned by the Sixth Amendment, nor does it justify reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect". *Cronic,* 466 U.S. at 662 n. 31, 104 S.Ct. 2039. Nevertheless, that the denial of counsel in *Geders, Herring,* and *Hamilton* was government-instigated serves to distinguish those cases from Burdine's. And, because the government was *not* responsible for Cannon's sleeping, such conduct was *not* "easy for [it] to prevent". *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052.

Moreover, the stage of the proceeding at which counsel was denied in *Geders, Herring,* and *Hamilton,* was easily identifiable. *See Geders,* 425 U.S. at 82, 96 S.Ct. 1330 (overnight recess); *Herring,* 422 U.S. at 864–65, 95 S.Ct. 2550 (closing argument); *Hamilton,* 368 U.S. at 53, 82 S.Ct. 157 (arraignment). In contrast, as discussed *infra,* it is impossible to identify the portions of trial during which Cannon slept. Accordingly, Burdine's claim does *not* "involve impairments of the Sixth Amendment right that are easy to identify". *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052.

Burdine contends that *Javor v. United States*, 724 F.2d 831 (9th Cir.1984), supports a conclusion that his claim is encompassed by the critical stage circumstance described in *Cronic*. *Javor* was cited in Justice Brennan's concurring opinion in *Strickland*, 466 U.S. at 703 n. 2, 104 S.Ct. 2052, as an example of a case in which counsel's incompetence was so serious that it equated with constructive denial of counsel. *Javor* held prejudice was inherent where counsel slept through a *substantial portion* of trial. *Javor*, 724 F.2d at 833.

In 1987, when Burdine's conviction became final, Texas courts would *not* have felt compelled to apply *Javor*. *Cf. Magouirk v. Phillips*, 144 F.3d 348, 361 (5th Cir.1998) ("state courts are not bound by Fifth Circuit precedent when making a determination of federal law"). Moreover, neither *Cronic* nor the majority opinion in *Strickland* cited *Javor* as an example of denial of counsel at a *critical stage*. Accordingly, Burdine seeks a *new rule* within the meaning of *Teague*. Therefore, unless his claim meets one of the narrow exceptions to the *Teague* nonretroactivity principle, we are barred from considering it.

### 2.

"*Teague* provides that a new constitutional rule can apply retroactively on federal collateral review only if the new rule (1) puts certain kinds of primary, private conduct beyond the power of the criminal law-making authority to proscribe or (2) is a rule of procedure that is implicit in the concept of ordered liberty." *Fisher*, 169 F.3d at 306 (internal quotation marks and citation omitted). As discussed *infra*, our court has recently utilized a third narrow exception.

### a.

Burdine seeks, *inter alia*, shelter within the second exception, "reserved for watershed rules of criminal procedure that implicate the fundamental fairness and accuracy of the proceeding". *Id.* He asserts that both elements of that exception—fairness and accuracy—are violated when a capital defendant is denied assistance of counsel during a significant portion of trial.

Under the circumstances of this case, including the claim *not* being presented until nearly 11 years after trial, and the impossibility of identifying the portions of trial during which Cannon slept, it is *not* necessary to create a *new rule of presumptive prejudice* in order to promote fundamental fairness and ensure an accurate determination of guilt or innocence or punishment. Those goals can be achieved satisfactorily—and with far greater assurance of accuracy—through analysis under the *Strickland* prejudice test. *See Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996) ("Ordinarily, episodes of inattention or slumber are perfectly amenable to analysis under the *Strickland* prejudice test."). That is especially true here, where Burdine, who sat beside Cannon throughout trial, has neither stated in an affidavit nor testified that he observed Cannon sleeping, and where the witnesses' testimony at the evidentiary hearing, regarding the amount of sleeping and when it occurred, *cannot* be corroborated by reviewing the trial transcript.

### b.

Burdine also claims an exception to *Teague* for claimed constitutional rights susceptible of vindication *only* on habeas review, asserting that his ineffective assistance claims could *not* be raised on direct appeal because he was represented by the same counsel who slept during his trial (even though Burdine *requested* that Cannon represent him on appeal) and because, in any event, the claim required development of facts outside the trial record. Following oral argument in the case at hand, our court, in *Jackson v. Johnson*, 217 F.3d 360, 364 (5th Cir.2000), utilized a somewhat similar third, quite narrow *Teague* exception.

Jackson's Texas state court conviction for aggravated assault was affirmed on direct appeal by the Texas intermediate appellate court. Jackson neither filed a timely motion for rehearing with that court nor sought discretionary review by the Texas Court of Criminal Appeals. *Id.* at 363. On habeas review, Jackson claimed his attorney rendered ineffective assistance by failing to timely file a motion for rehearing with the intermediate appellate court. *Id.* at 361, 363.

Our court concluded that a holding that an "opportunity to file a motion for rehearing should be considered the last step in [Jackson's] first appeal of right ... would surely create a new rule of constitutional law" under *Teague. Id.* at 363–64. But, it held that Jackson's claim satisfied "a third narrow exception to *Teague, heretofore unrecognized by the courts*". *Id.* at 364 (emphasis added). "When an alleged constitutional right is susceptible of vindication only on habeas review, application of *Teague* to bar full consideration of the claim would effectively foreclose any opportunity for the right ever to be recognized." *Id.*

Arguably, the right asserted by Jackson was one that could *never* be raised on direct appeal. *Id.* at 364. In any event, the holding in *Jackson* must be limited to the facts in that case. That holding has obvious, wide-ranging implications concerning the limits mandated by *Teague* for habeas review. The exception utilized in *Jackson* cannot be allowed to swallow the rule announced in *Teague.* How the *Jackson* holding will come into play must be decided on a case-by-case basis.

Regardless of *Jackson's* reach, the right asserted by Burdine would *not* seem to fall within the very narrow category utilized in *Jackson.* Restated, the exception utilized in *Jackson* would *not* seem to cover Burdine's assertion that his claim could *not* have been raised on direct appeal.

Burdine asserts it could *not* have been so raised, because he was represented on appeal by the same counsel who slept during his trial. Burdine should have noted such conduct and *not* have requested that Cannon represent him on appeal. While we do *not* hold that such request, on this record, constitutes a *waiver* of Burdine's ineffective assistance claim regarding Cannon's sleeping, we are troubled, to say the least, by wide-ranging abuses that can result where, as here, a criminal defendant sits next to counsel during trial; makes *no* mention then of counsel sleeping during trial; requests that the same counsel represent him on direct appeal; and then, over ten years after trial, claims ineffective assistance because counsel slept during trial, despite defendant never, by affidavit or testimony, stating under oath that counsel engaged in such conduct. Cannon is *not* the only person in this case who slept; Burdine slumbered as well—on his rights.

Burdine contends, alternatively, that, on direct appeal, he could *not* have asserted the claim now at issue, because it required development of facts outside the trial record. But, Burdine, who sat next to counsel throughout trial, could have brought counsel's sleeping to the attention of the trial court during trial, which may, at the very least, have allowed development of the facts at that time. Along this line, perhaps counsel's sleeping could have been the basis for a new trial.

In this regard, we are quite hampered in our analysis and in reaching a conclusion as to this claimed exception because the State, in its reply brief, does *not* address the possible options—such as seeking a new trial—that may have been available to Burdine. Instead, it maintains that Burdine's claim must be considered under the *Strickland* test.

In sum, it appears that Burdine's claim is *not* one that could *never* be raised on direct appeal under any circumstances. In other words, the alleged constitutional right he claims does *not* appear to be one that "is susceptible of vindication *only* on habeas review". *Jackson,* 217 F.3d at 364 (emphasis added).

Accordingly, it would seem that Burdine's claim does *not* fall within the quite narrow *Teague* exception utilized in *Jackson*. But, out of an abundance of caution, we will assume that it does and, therefore, address the merits of his claim.

#### B.

Regarding the usual deficient performance and prejudice prongs necessary for showing ineffective assistance, *see Strickland*, 466 U.S. at 687, 694, 104 S.Ct. 2052, Burdine contends that a constructive denial of counsel occurs when defense counsel sleeps during portions of a capital murder trial, warranting a presumption of prejudice. The State maintains that the circumstances of this case, as discussed *infra*, require showing prejudice.

As discussed, the Court has articulated three reasons for *presuming*, rather than requiring proof of, prejudice in cases involving the actual or constructive denial of counsel: (1) "[p]rejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost", *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052; (2) "such circumstances involve impairments of the Sixth Amendment right that are easy to identify", *id.*; and (3) such circumstances are "easy for the government to prevent" because "the prosecution is directly responsible". *Id.*; *Cronic*, 466 U.S. at 658, 104 S.Ct. 2039.

■ In the light of the circumstances of this case, none of those justifications supports presuming prejudice. First, neither the prosecutor nor the trial judge (*nor Burdine* ) was aware of Cannon's sleeping; accordingly, such conduct could *not* have been easily prevented by the State.

Second, the claim was *not* raised until over ten years after trial, after it was first raised by another death row inmate. Therefore, a determination of precisely when counsel slept has been rendered impossible due to the passage of time and the lack of *any* indication in the trial transcript, as discussed *infra*, as to when the conduct occurred. Nor can it be determined from the witnesses' testimony at the state evidentiary hearing. Accordingly, it is impossible to determine whether, for example, counsel slept during the presentation of crucial, inculpatory evidence, or during the introduction of unobjectionable, uncontested evidence.

■ Finally, for circumstances where, as here, counsel sleeps for unidentified portions of a trial, prejudice is *not* so likely that case-by-case inquiry into prejudice is *not* worth the cost. "[O]nce it is necessary to examine the trial record in order to evaluate counsel's particular errors, resort to a *per se* presumption is no longer justified by the wish to avoid the cost of case-by-case litigation." *Scarpa v. DuBois*, 38 F.3d 1, 14 (1st Cir.1994) (refusing to presume prejudice where defense counsel's argument effectively conceded the only disputed elements of the charged crimes), *cert. denied*, 513 U.S. 1129, 115 S.Ct. 940, 130 L.Ed.2d 885 (1995).

> [T]here are real dangers in presuming prejudice merely from a lack of alertness. Prolonged inattention during stretches of a long trial (by sleep, preoccupation or otherwise), *particularly during periods concerned with ... uncontested issues*, or matters peripheral to a particular defendant, may be quantitatively substantial but without consequence. At such times, even alert and resourceful counsel *cannot affect* the proceedings to a client's advantage.

*Tippins*, 77 F.3d at 686 (emphasis added). *Tippins* observed, however, that prejudice becomes " 'inherent' at some point, 'because unconscious or sleeping counsel is equivalent to no counsel at all' ". *Id.* (quoting *Javor*, 724 F.2d at 834). The court concluded "that Tippins suffered prejudice, by presumption or otherwise, if his counsel was repeatedly unconscious at trial for periods of time in which defendant's interests were at stake". *Id.* at 687.

For many cases in which prejudice has been presumed, the circumstances justifying that presumption are clearly discernible. *See, e.g., Geders,* 425 U.S. at 91 (court prevented defendant from consulting with counsel during overnight recess between defendant's direct and cross-examination); *Hamilton,* 368 U.S. at 55, 82 S.Ct. 157 (defendant denied counsel at arraignment); *Hughes v. Booker,* 220 F.3d 346, 352 (5th Cir.2000) (attorney withdrew from representation of defendant on appeal without filing sufficient brief); *United States v. Russell,* 205 F.3d 768, 770–72 (5th Cir. 2000) (testimony implicating defendant in conspiracy presented during counsel's two-day absence due to illness); *Blankenship v. Johnson,* 118 F.3d 312, 317 (5th Cir. 1997) (appointed counsel did "nothing whatsoever" on state-requested discretionary appeal).[1]

■■■ Moreover, the presumptive prejudice exception to *Strickland* is a very narrow one. *See Childress,* 103 F.3d at 1229 ("constructive denial of counsel as described in *Cronic* affords only a narrow exception to the requirement that prejudice must be proved"); *Craker v. McCotter,* 805 F.2d 538, 542 (5th Cir.1986) ("A constructive denial of counsel occurs ... in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." (internal quotation marks and citation omitted)); *Hollenback v. United States,* 987 F.2d 1272, 1275 (7th Cir.1993) ("cases in which an inherently prejudicial constructive absence of counsel has been found involve particularly egregious conduct that is the functional equivalent of actual absence of counsel").

Prejudice has *not* been presumed for claims of denial of effective assistance of counsel due to counsel's alleged impairment because of alcohol, drug use, or a mental condition. *See, e.g., Burnett v. Collins,* 982 F.2d 922, 928–30 (5th Cir.1993) (alcohol abuse); *Berry v. King,* 765 F.2d 451, 454 (5th Cir.1985) (addiction to illegal drugs), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2290, 90 L.Ed.2d 731 (1986); *Buckelew v. United States,* 575 F.2d 515, 521 (5th Cir.1978) (poor health); *Dows v. Wood,* 211 F.3d 480, 485–86 (9th Cir.) (Alzheimer's disease), *cert. denied,* —— U.S. ——, 121 S.Ct. 254, 148 L.Ed.2d 183 (2000); *Smith v. Ylst,* 826 F.2d 872, 875–76 (9th Cir.1987) (mental illness), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988); *Hernandez v. Wainwright,* 634 F.Supp. 241, 245 (S.D.Fla.1986) (intoxication during trial), *aff'd,* 813 F.2d 409 (11th Cir.1987).

*Javor* and *Tippins* do *not* fit comfortably within that framework. Neverthe-

1. For additional instances of such presumed prejudice, *see Harris v. Day,* 226 F.3d 361, 362 (5th Cir.2000) (counsel on direct appeal filed "errors patent" brief and subsequently withdrew, filing brief that failed to mention any arguable issues); *Childress,* 103 F.3d at 1231–32 (defense counsel appointed solely to execute defendant's waiver of jury trial and performed no other service for defendant); *United States v. Taylor,* 933 F.2d 307, 312 (5th Cir.) (court denied defendant's request to withdraw waiver of counsel and defendant assisted by standby counsel at sentencing), *cert. denied,* 502 U.S. 883, 112 S.Ct. 235, 116 L.Ed.2d 191 (1991); *United States v. Patterson,* 215 F.3d 776, 785–86 (7th Cir.2000) (counsel was absent multiple days of trial at which defendant was accused of conspiring with other defendants); *Frazer v. United States,* 18 F.3d 778, 783 (9th Cir.1994) (ap-

pointed counsel called defendant "stupid nigger son of a bitch" and threatened to provide substandard performance if defendant chose to exercise right to trial); *United States v. Swanson,* 943 F.2d 1070, 1071–74 (9th Cir. 1991) (during closing argument, counsel conceded *no* reasonable doubt existed as to only factual issues in dispute); *Harding v. Davis,* 878 F.2d 1341, 1345 (11th Cir.1989) (counsel failed to object when trial court directed verdict against defendant); *Siverson v. O'Leary,* 764 F.2d 1208, 1217 (7th Cir.1985) (counsel absent during jury deliberations and return of verdict); *Martin v. Rose,* 744 F.2d 1245, 1250–51 (6th Cir.1984) (counsel refused to participate in trial because believed erroneously such participation would waive pretrial motions or render their denial harmless error).

less, both are distinguishable from the circumstances at hand. In *Javor*, there was evidence that defense counsel was asleep during a substantial portion of trial; counsel failed to participate when evidence against the defendant was being presented; counsel had stated to counsel for a co-defendant that he had missed some of the testimony; other counsel often "nudged" and "kicked" counsel to awaken him; and the judge was at times concerned about counsel's inattentiveness. *Javor*, 724 F.2d at 833–34. In *Tippins*, there was evidence that Tippins' counsel slept every day of the trial, including during the testimony of a critical prosecution witness and during damaging testimony by a co-defendant; and the sleeping was noticed by both the trial judge and prosecutor, as well as jurors and witnesses, some of whom even heard him snoring. *Tippins*, 77 F.3d at 687–89.

In contrast, Cannon's sleeping was *not* nearly so obvious. As stated, the record does *not* permit identification of the portions of trial during which Cannon slept. We are, therefore, unable to determine if he slept, for example, during the presentation of uncontested, unobjectionable exhibits or testimony. Moreover, as noted, Cannon's sleeping, although noticed by the court reporter and several jurors, went unnoticed by the trial judge and prosecutor, and *apparently even by Burdine*, who sat next to Cannon throughout trial, but has never stated by affidavit or testified that he observed Cannon sleeping or dozing during trial. In fact, at the conclusion of trial, as also noted, Burdine requested that Cannon be appointed to represent him on appeal.

Burdine contends that presentation of any evidence against a criminal defendant in a capital murder trial is at a "critical stage" of the proceeding. Our court recently rejected a claim that the taking of any evidence at trial in the absence of counsel is prejudicial *per se* under *Cronic*, noting that it "does not so hold" and declining to fashion such a rule. *Russell*, 205

F.3d at 771. *See also Vines v. United States*, 28 F.3d 1123, 1128 (11th Cir.1994) (rejecting defendant's contention that the taking of evidence is necessarily a critical stage of trial and declining to presume prejudice when *no* evidence directly inculpating defendant was presented while counsel was temporarily absent).

Although "*Cronic* does not provide significant guidance on which parts of trial are considered 'critical' ", it provides some guidance for determining whether the absence of counsel is at such a stage:

> First, there must be a denial of such significance that it makes the adversary process itself unreliable.... Second, the *Cronic* court makes clear that "*only* when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial."

*Russell*, 205 F.3d at 771 (quoting *Cronic*, 466 U.S. at 662, 104 S.Ct. 2039 (emphasis in original)). Our court concluded that Russell's counsel was absent during a "critical stage" where, during that absence, the Government presented evidence implicating several of his co-conspirators, although *not* directly implicating Russell. *Id.* at 770–72. Our court explained that, under such circumstances, "[t]he adversary process becomes unreliable when no attorney is present to keep the taint of conspiracy from spreading to the client". *Id.* at 772. But, as noted, unlike in *Russell*, where the evidence presented during counsel's absence was easily identifiable, we cannot determine from the trial transcript or witness testimony at the state evidentiary hearing what evidence was being presented, or other activity was taking place, while counsel slept.

Voir dire took seven days. The balance of the trial lasted six: three for presentation of evidence in the guilt-innocence phase; one during which the jury was charged, closing arguments were made, and the jury reached its verdict for that phase; one for presentation of evidence in

the punishment phase; and one during which the jury was charged, closing arguments were made, and the jury reached its verdict for that phase.

Strickland, the jury foreman, testified at the state habeas evidentiary hearing that: on several occasions Cannon appeared to "nod off" or "doze"; he noticed the dozing "more than two, but maybe not more than five times"; the dozing occurred during the guilt-innocence phase, typically in the afternoon, after the lunch recess, when witnesses were being questioned or other evidence was being presented; and the observed episodes were 30 seconds or less in length.

Davis, another juror, testified at the hearing that she noticed Cannon repeatedly falling asleep during "quite a bit" of the guilt-innocence phase, especially during the afternoon of the second and third days of testimony.

Another juror, Engelhardt, testified that, on five or ten occasions, covering both phases of trial, he noticed Cannon "nodding" or "dozing"; and, on one occasion, Cannon had his eyes closed and his head bowed *for at least ten minutes*. But, Engelhardt could *not* remember what was occurring at the time of the incidents *or* whether they were in the morning or afternoon.

Berry, a court clerk assigned to assist the trial judge, testified that she witnessed Cannon sleeping "a lot" and "for long periods of time" during questioning of witnesses; the longest instance was at least *ten minutes;* and there were "lots of incidents" when Cannon dozed for shorter periods.

As discussed below, an obvious possible critical stage would be the ten-minute period, or periods, during which, according to two witnesses, Cannon slept; but, as noted, that period, or those periods, *cannot* be tied to a particular point during the trial. Examining the trial transcript and minutes in conjunction with the above-described testimony, we simply are unable to determine when Cannon slept, much less whether he did so during the presentation of contested, inculpatory evidence. *Burdine conceded this at oral argument.*

The presentation of evidence commenced at 10:50 a.m. on Monday, 23 January 1984. The State's first witness, a homicide detective, testified about his investigation of the murder and the discovery of the victim's body. Direct examination was completed when the court recessed at noon for lunch, and covers pages 27–80 of the transcript. The transcript and minutes reflect the following activity involving Cannon during that direct examination: he objected (page 43); the jury retired while the court reporter marked 34 exhibits (pages 45–46); Cannon requested time to examine photographs and, at 11:22 a.m., made objections, outside the presence of the jury, to some of the exhibits (pages 50–53); the jury returned at 11:29 a.m. (page 54); Cannon objected (pages 69–70); and Cannon questioned the witness on voir dire (pages 73–79).

Trial resumed at 1:30 p.m., Cannon's cross-examination of the homicide detective covering pages 83–90 of the transcript. The State's redirect is at pages 90–98, with Cannon speaking on the record at 91, 92, 95, and 97. Cannon's recross is at 99–101; further redirect, at 101–02.

The State's next witness, the medical examiner, testified regarding the victim's wounds and cause of death. For the direct examination, which covers pages 103–19, Cannon objected at 109 and 118; his cross-examination covers pages 119–23. The State's redirect covers 123–29, interrupted at 126–27 by a bench conference requested by Cannon. Cannon conducted recross at page 130. A bench conference outside the hearing of the court reporter was conducted at page 131.

The State's final witness for the first day of testimony was a detective, who testified regarding tracing the victim's stolen gun. The direct examination covers

pages 131–37; Cannon's cross, 137–38. After the jury was excused for the day (2:57 p.m.), the trial judge began a hearing on the admissibility of Burdine's confession.

The State's presentation of evidence resumed at 10:17 a.m. on Tuesday, 24 January, following completion of the admissibility hearing. The State's first witness was the manager of the pawn shop where, following the murder, Burdine pawned a ring. Direct examination covers pages 204–10; cross-examination, 210–12.

The next witness on this second day of testimony, a bank security administrator, authenticated a tape showing Burdine, following the murder, withdrawing money from an automatic teller machine. Direct examination covers pages 212–19, and includes showing the tape to the jury. At page 216, Cannon stated he had *no* objection to the tape; at 220, *no* questions for that witness.

The State's next witness was an automatic teller machine coordinator for a credit union where, following the murder, Burdine withdrew money from the victim's account. The direct examination covers pages 220–23. At 223, Cannon stated he had *no* questions for the witness, and a bench conference was conducted outside the hearing of the court reporter. At pages 224 and 226, Cannon stated that he had *no* objections to the tape of the ATM transaction.

The State's next witness was the owner of the California shop where, following the murder, Burdine sold the victim's gun. The direct examination covers pages 226–36, interrupted by Cannon's objections at 229 and 235. At 236, Cannon stated he had *no* questions for the witness. At 237, a bench conference was conducted outside the hearing of the court reporter.

The State recalled its first witness from the first day of testimony, the homicide detective. He testified about Burdine's custodial statement in California. Direct examination was conducted until the court recessed for lunch at 11:53 a.m. (page 257), and continued when trial resumed at 1:48 p.m.; it covers pages 237–63. For the pre-noon-recess testimony, covering 237–57, the record reflects activity by Cannon at 255 and 256; following the recess, at 259–60 and 262. Cannon's cross-examination appears at 264–75. The State's redirect, at 276–81, was interrupted by an objection by Cannon (page 278). Cannon's recross covers 281–83.

The State's next witness, a receptionist at the security service where both the victim and Burdine worked, testified regarding Burdine's use of an alias during that employment. Direct examination covers pages 283–90; at 287, Cannon stated he had *no* objection to an exhibit. His cross-examination covers 291–92.

The next witness was the California detective who arrested Burdine. Direct examination covers pages 293–302. Cannon requested a bench conference, and the court was in recess from 2:46 p.m. until 3:24 p.m. Cannon cross-examined the witness on page 304, after which another bench conference was conducted.

The final witness for the second day of testimony was the victim's roommate, who testified about his relationships with the victim and Burdine, his discovery of the victim's body, and various items of property taken in the robbery. Direct examination covers 305–37, interrupted by one objection by Cannon at 316.

During that direct examination, and at the request of a juror, court was in recess from 4:05 p.m. until 4:16 p.m. Thereafter, Cannon cross-examined the witness at pages 337–49. The State's redirect covers pages 349–52; Cannon's recross, 353–54. After the State rested at 4:31 p.m., the jury was excused for the day.

On Wednesday, 25 January, the third day of testimony, Cannon moved for an instructed verdict (judgment of acquittal) outside the presence of the jury. At 10:17 a.m., when the jury was brought into the

courtroom, the State re-opened to offer exhibits, and again rested.

Burdine testified on direct examination at pages 363–418. His cross-examination, at 419–90, was interrupted by a bench conference, at page 485, and the noon recess, which lasted from 12:38 p.m. until 2:20 p.m. Only the last five pages of the State's cross-examination were conducted following the recess. Cannon conducted redirect of Burdine at pages 491–95. Burdine rested at 2:33 p.m.

In rebuttal, the State called another detective, who testified regarding Burdine's custodial statement in California. The State's direct examination covers pages 496–512, interrupted by objections by Cannon at 504, 507, and 508–09. Cannon's cross-examination covers 513–15. Following a very brief redirect examination by the State, Cannon requested a bench conference (pages 517–18), which lasted from 2:56 until 3:12 p.m., following which the State rested. Cannon then called one additional witness on behalf of Burdine. After both sides rested at 3:15 p.m., the jury was excused for the day.

The next day of trial (after three days of testimony) began at 10:50 a.m. on Thursday, 26 January. After the charge was read to the jury, the State presented its initial closing argument from 11:02 until 11:37 a.m. Cannon presented closing argument from 11:37 a.m. until 12:07 p.m.; and the State presented its final closing argument from 12:07 until 12:15 p.m., following which the jury retired to deliberate. The jury returned a guilty verdict at 2:10 p.m. and court recessed for the day.

Punishment phase proceedings began at 10:30 a.m. the next day, Friday, 27 January. The State presented the testimony of four witnesses between 10:30 and 11:05 a.m., covering pages 607–36, and then rested. The record reflects activity by Cannon at 608, 609, 616, 618, 621, 622–23, 624, 625–26, 626, 627, 629, 631, and 635–36. Following a recess, court reconvened at 11:28 a.m., at which time Burdine rested

without presenting any evidence. Court was recessed until the following Monday.

On Monday, 30 January, proceedings commenced at 10:40 a.m., when the punishment phase charge was read to the jury. The State presented its initial argument from 10:45 until 11:15 a.m.; Cannon, 11:15 until 11:44 a.m.; and the State, 11:44 until 11:53 a.m. The jury retired to deliberate and reach a verdict on punishment.

As reflected in this detailed examination of the trial transcript, there are very few long stretches of transcript in which *no* activity by Cannon is reflected. Portions of the transcript reflecting *no* such activity involve the presentation of contested, inculpatory evidence, as well as uncontested testimony and exhibits, where Cannon's attentive participation was irrelevant to the quality of Burdine's defense.

For example, during direct examination of the first witness for the State, the prosecution introduced 31 crime scene photographs and questioned the witness about each one individually. Although the record reflects *no* activity by Cannon at 55–65, he had already examined the photographs outside the presence of the jury; he had objections to only six of the photographs; and the court had already overruled those objections.

Following the lunch recess on the second day of trial, the prosecution introduced 46 photographs of property recovered after Burdine's arrest, and questioned the detective about whether each photograph accurately depicted the items found. Those photographs were admitted into evidence without objection. The prosecutor questioned the victim's roommate about much of that same photographic evidence.

Another period during which *no* activity is reflected for Cannon was during the State's cross-examination of Burdine. As noted, for the 72 pages of cross, only five follow the lunch recess, when counsel's sleeping might be more likely. As also noted, Cannon's defense strategy was that

the acts of violence were committed by the other actor; and that the victim had taken advantage of Burdine in the homosexual relationship, by depositing Burdine's pay checks into his (the victim's) account and spending Burdine's money, and by attempting to persuade Burdine to prostitute himself.

Obviously, a great number of trial strategy considerations, including frequency of objections during cross-examination, are at play when a criminal defendant elects to testify, especially, on the facts in this case, with Burdine admitting being present at the murder. For example, Cannon did *not* object when, on cross, Burdine was asked about a possible characteristic of a homosexual relationship; this decision was arguably consistent with his defense strategy. Moreover, to have objected at certain points might have caused the jury to feel Cannon was trying to prevent Burdine from presenting relevant information; on the other hand, Cannon's *not* objecting might have been understood by the jury as showing Burdine had nothing to hide. Deciding whether to object is, in many instances, simply a classic example of trial strategy.

In the light of these examples, it is possible that unobjectionable evidence (or evidence which Cannon was already anticipating) may have been introduced while Cannon slept, without having any substantial effect on the reliability or fairness of Burdine's trial. But, Burdine essentially asks us to assume that Cannon slept during the portions of the proceedings for which the transcript reflects no activity by him. In the light of the foregoing discussion and the rather vague testimony of the witnesses at the state habeas evidentiary hearing regarding when Cannon slept, it would be inappropriate for us to engage in such speculation. In sum, on this record, we *cannot* determine whether Cannon slept during a "critical stage" of Burdine's trial.

Because of the different circumstances presented by Burdine's claim, we need *not* decide whether, if presented with circumstances analogous to those in *Javor* and *Tippins*, it would be appropriate to presume prejudice. Instead, we hold that, under the above described circumstances, presumptive prejudice is *not* warranted.

Of course, our rejecting Burdine's presumptive prejudice claim should *not* be understood as condoning sleeping by defense counsel during a capital murder trial (or any other trial, for that matter). Again, we hold *only* that, *under the specific circumstances of this case*, in which it is impossible to determine—instead, only to speculate—that counsel's sleeping was at a critical stage of the trial, prejudice *cannot* be presumed; the *Strickland* prejudice analysis is adequate to safeguard the Sixth Amendment guarantee of effective assistance of counsel.

### C.

The State maintains that the district court's application of a prejudice presumption conflicts with *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (on collateral review, trial error requires reversal *only* if it had a "substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks and citation omitted)). In the light of our reversal of the presumption of prejudice, and remand for analysis under *Strickland,* it is *not* necessary to address this contention.

Nevertheless, in our supervisory role, we simply acknowledge that our court has rejected such a contention, holding that, once it is determined a *constructive denial of counsel has occurred, and prejudice is presumed,* it is inappropriate to apply harmless error analysis. *Barrientes v. Johnson,* 221 F.3d 741, 756 (5th Cir.2000) (*Brecht* harmless error analysis unnecessary when inquiry for habeas claim requires application of "reasonable probability" standard, such as for *Strickland* claims (citing *Kyles v. Whitley,* 514 U.S. 419, 435–36, 115 S.Ct. 1555, 131 L.Ed.2d 490

(1995))); *Hughes v. Booker*, 220 F.3d at 353 (once court determines that defendant has been constructively denied counsel, harmless error analysis is unnecessary). *Cf. Murphy v. Puckett*, 893 F.2d 94, 96 (5th Cir.1990) (*Chapman* harmless error analysis inapplicable where habeas petitioner has shown that prejudice, as defined in *Strickland*, resulted from counsel's deficient representation).

### III.

For the foregoing reasons, the habeas relief is VACATED, and this case is REMANDED to the district court for further proceedings.

*VACATED and REMANDED.*

BENAVIDES, Circuit Judge, dissenting:

We have a state court finding that counsel slept "during portions of [Calvin Burdine's capital murder] trial on the merits, in particular during the guilt-innocence phase when the State's solo prosecutor was questioning witnesses and presenting evidence." Although the Texas Court of Criminal Appeals rejected Burdine's habeas application, it found that the trial court's findings (i.e., "defense counsel repeatedly dozed and/or actually slept during substantial portions of [Burdine's] capital murder trial") were supported by the record. Additionally, the State concedes that we are bound by those findings of fact.

It is well established that a defendant "requires the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932). I conclude that being represented by counsel who slept through substantial portions of a client's capital murder trial violates the Sixth Amendment right to counsel, and, thus, Burdine should be entitled to a new trial with the benefit of counsel who does not sleep during substantial portions of his trial. In my opinion, it shocks the conscience that a defendant could be sentenced to death under the circumstances surrounding counsel's representation of Burdine.

### I. RETROACTIVITY ANALYSIS

I disagree with the majority's conclusion that Burdine's claim creates a new rule under *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Although the majority believes that Burdine's case does not fall within an exception to Teague, it nonetheless assumes that it does and addresses the merits of Burdine's claim.

I, on the other hand, am convinced that granting relief on Burdine's claim does not require announcing a new constitutional rule of criminal procedure. With respect to the merits of the claim, I believe that the undisputed state court findings warrant presuming prejudice without delving into counsel's actual performance at trial.

In *Teague*, a plurality of the Supreme Court espoused Justice Harlan's view of retroactivity that a new rule would not be applied on collateral review to cases that became final prior to the announcement of the new rule. Acknowledging that the task of determining whether a case announces a new rule is often difficult, the plurality expressly did not "attempt to define the spectrum of what may or may not constitute a new rule" for purposes of retroactivity. *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070. Generally speaking, however, a case announces a new rule if it breaks new ground or imposes a heretofore new obligation on the States or the federal government. *Id.* In other words, if the result was not dictated by precedent existing at the time the petitioner's conviction became final, such a case announces a new rule.

Shortly thereafter, the plurality's retroactivity analysis became part of the holding in *Penry v. Lynaugh*, 492 U.S. 302, 316, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The analysis in *Penry* is instructive with respect to what constitutes a new rule under *Teague*. Penry claimed that

the jury was unable to fully consider and give effect to mitigating evidence of his mental retardation and childhood abuse when it answered the three statutory special issues at sentencing in violation of the Eighth Amendment. Penry did not make a facial challenge to the Texas death penalty statute. Of course, prior to Penry, the Supreme Court had upheld the statute against a facial, Eighth Amendment challenge in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

Instead, Penry claimed that, *"on the facts of [his] case,* the jury was unable to fully consider and give effect to the mitigating evidence . . . in answering the three special issues." 492 U.S. at 315, 109 S.Ct. at 2945 (emphasis added). The Supreme Court opined that such a claim for relief did not impose a new obligation on Texas. "Rather, Penry simply asks the State to fulfill the assurance upon which *Jurek* was based: namely, that the special issues would be interpreted broadly enough to permit the sentencer to consider all of the relevant mitigating evidence a defendant might present in imposing sentence." *Id.*

In the case at bar, I believe that *Teague* does not bar Burdine's claim for relief because it is simply a request to enforce his Sixth Amendment right to have effective assistance of counsel at every critical stage of his capital murder trial.[1] Burdine's claim is that, on the facts of his case, he was denied counsel.

Prior to Burdine's conviction becoming final, the Supreme Court held that, to prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, the same day the

Supreme Court decided *Strickland,* it also decided *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Cronic,* the Supreme Court opined that "in some cases the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided. Clearly, in such cases, the defendant's Sixth Amendment right to have Assistance of Counsel is denied." 466 U.S. at 656, 104 S.Ct. at 2044 n. 11 (internal quotation marks and citation omitted). The Supreme Court explained that although the petitioner generally bears the burden of demonstrating a constitutional violation, there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658, 104 S.Ct. at 2046. Stating what it termed obvious, the Court explained that a complete denial of counsel would warrant a presumption of prejudice. *Id.* at 659, 104 S.Ct. at 2046. Because our system of justice deems essential the assistance of counsel, "a trial is unfair if the accused is denied counsel at a critical stage of his trial." *Id.* Likewise, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* The Court explained that "only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Id.* at 662, 104 S.Ct. at 2048. Ultimately, in *Cronic,* the Supreme Court held the circumstances of the case (inexperienced counsel was given only 25 days to prepare for trial on complex mail fraud charges) did not warrant presuming prejudice.[2]

---

1. *Cf. Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 1610, 140 L.Ed.2d 828 (1998) (rejecting the argument that the petitioner's claim that his guilty plea was not knowing and intelligent was barred by *Teague* in part because "[t]here is surely nothing new about this principle . . . .").

2. The State urges that the instant claim requires a new rule because in *Cronic,* the Court did not presume prejudice. Thus, the State argues, the language in *Cronic* with respect to presuming prejudice is dictum. However, the Court noted that it had "uniformly found constitutional error without any

The rule I glean from *Cronic* is that we must look to the circumstances surrounding counsel's representation (or lack thereof) to determine whether a presumption of prejudice is warranted. That is the rule I believe should be applied to Burdine's case. Such a rule by its nature requires a case-by-case determination. As Justice O'Connor has opined, "[i]f a proffered factual distinction between the case under consideration and pre-existing precedent does not change the force with which the precedent's underlying principle applies, the distinction is not meaningful, and any deviation from precedent is not reasonable." *Wright v. West*, 505 U.S. 277, 304, 112 S.Ct. 2482, 2497, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring). Because *Cronic* was decided prior to Burdine's conviction becoming final, Teague poses no bar to applying the rule in *Cronic*.[3]

We recently applied *Cronic* to an appeal from a 28 U.S.C. § 2255. See *United States v. Russell*, 205 F.3d 768 (5th Cir. 2000). In that case, Russell, along with 16 codefendants, was on trial for conspiracy to possess drugs and conspiracy to launder money. Several days into the trial, Russell's counsel fell ill and was absent for two days before returning to trial. An attorney for a codefendant represented to the court that he had Russell's permission to represent Russell that one day. The district court neither apprised Russell of his rights nor made any inquiries of Russell on or off the record. We stated that it was unclear whether the district court accepted counsel's attempt to offer to represent Russell. *Russell*, 205 F.3d at 769–71. Thus, we concluded that Russell did not have counsel and did not waive his right to counsel for the two days in question. After instructing the government that no evidence directly relating to Russell be presented during counsel's absence, the court allowed the trial to continue.

On appeal from the denial of his section 2255 motion, Russell urged this Court to hold that the taking of any evidence at trial in the absence of counsel warrants a presumption of prejudice under *Cronic*. We disagreed. *Id.* at 771. Instead, we recognized *Cronic* held that because the guiding hand of counsel is essential, "'a trial is unfair if the accused is denied counsel at a critical stage of his trial.'" *Id.* (quoting *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2047). We further opined that although *Cronic* did not provide much guidance with respect to what parts of a trial are "critical," it did make clear the following:

> First, there must be a denial of such significance that it makes the adversary process itself unreliable. [*Cronic*, 466

showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n. 25, 104 S.Ct. at 2047 n. 25 (citations omitted). Moreover, prior to Burdine's conviction becoming final, we recognized the law was "well settled that a criminal defendant is entitled to counsel at every stage of a criminal proceeding where substantial rights are involved." *Davis v. Estelle*, 529 F.2d 437, 439 (5th Cir.1976) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)).

3. The State argues that the district court erred in relying on *"Cronic's* reference to the 'denial' of counsel at a critical stage" because the Supreme Court "limited this language to denials of counsel that were attributable to the State or to the total failure of counsel to participate in the trial." No presumption of prejudice is warranted, posits the State, because there was neither a total failure to participate nor was the State responsible for Cannon's sleeping during portions of Burdine's trial. Although at first blush some of the language in *Cronic* appears to support the proposition that the State must be responsible for denying the presence of counsel at a critical stage of the trial, further reading of the opinion dispels that view. Specifically, the Court noted that the "fact that the accused can attribute a deficiency in his representation to a source external to trial counsel does not make it any more or less likely that he received the type of trial envisioned by the Sixth Amendment, nor does it justify reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect." *Cronic*, 466 U.S. at 662 n. 31, 104 S.Ct. at 2048 n. 31.

U.S. at 659, 104 S.Ct. at 2047]. Second, the Cronic court makes clear that "only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial."

205 F.3d at 771 (quoting *Cronic*, 466 U.S. at 662, 104 S.Ct. at 2048). We concluded that the adversary process was unreliable because counsel was not "present to keep the taint of conspiracy from spreading to the client." *Id.* at 772. Thus, we held that counsel's absence was at a critical stage of the trial and presumed prejudice.

Here, the majority attempts to distinguish *Russell* on the basis that the evidence presented during the absence of counsel in that case was easily identifiable, but in this case, "we cannot determine from the trial transcript or witness testimony at the state evidentiary hearing what evidence was being presented, or other activity was taking place, while counsel slept." Maj. op. at 960. In Burdine's case we have a state court finding that counsel slept "during portions of [Burdine's] trial on the merits, in particular during the guilt-innocence phase when the State's solo prosecutor was questioning witnesses and presenting evidence." Although we may not specifically know what evidence was being presented while counsel was slumbering, we know that it was being presented by the State against Burdine. In *Russell*, pursuant to the district court's instruction, the government was presenting evidence that directly related to his co-conspirators, not Russell. I rec-

ognize, as we did in *Russell*, that evidence against co-conspirators "inferentially increased the taint of guilt of Russell." 205 F.3d at 772. Nonetheless, certainly the evidence presented while counsel slept at Burdine's trial at the very least inferentially increased the taint of Burdine's guilt because he was the only defendant on trial. Indeed, it is arguably a more egregious Sixth Amendment violation to have counsel sleeping while evidence is presented against his client than to have counsel physically absent while evidence is presented against his client's coconspirators.

In the instant case, I believe the state court findings with respect to counsel sleeping during trial demonstrate a denial of such significance that the adversary process was rendered unreliable. These factual findings justify a presumption of prejudice without delving into counsel's actual performance at trial.[4]

In other words, I do not believe that *Teague* bars the claim to the extent Burdine argues he is entitled to a presumption of prejudice because counsel slept during trial such that there was a denial of counsel at a critical stage of his trial. Thus, the question is whether Burdine's claim rises to this level.

## II. CONSTRUCTIVE DENIAL OF COUNSEL

Both the majority and the State purport to accept the state trial court's findings that defense counsel slept during substantial portions of Burdine's trial.[5] Neverthe-

4. The majority takes pains to point out that Burdine failed to raise this claim until nearly eleven years after his trial. I am unsure of the relevance of this fact with respect to our analysis of the claim inasmuch as the state habeas court reached the merits of it and imposed no procedural bar to our addressing it. Also, the majority stresses that Burdine requested that Cannon represent him on direct appeal. Maj. op. at 955–56. I believe this fact is irrelevant in light of the Supreme Court edict that "we attach no weight to either [the defendant's] expression of satisfaction with counsel's performance at the time of

his trial, or to his later expression of dissatisfaction." *Cronic*, 466 U.S. at 657, 104 S.Ct. at 2046.

5. The state court set forth the following evidence supporting his finding:

Three members of the jury [Daniel Strickland, Myra Young Davis, and Craig Englehardt] and the clerk of the court [Rose Marie Berry] testified that they witnessed defense counsel repeatedly "nod off" or doze during the trial. All three jurors and the clerk testified that they saw Cannon's head repeatedly "bob" or "nod" in a man-

less, both the majority and the State painstakingly conduct a page-by-page review of the trial record in an apparent attempt to demonstrate that counsel was awake during significant portions of the trial.[6] Indeed, after chronicling the activity at trial, the majority states that "there are very few long stretches of transcript in which *no* activity by Cannon is reflected." Maj. op. at 963 (emphasis in original). The majority further states that "[p]ortions of the transcript reflecting no such activity involve the presentation of contested, inculpatory evidence, as well as uncontested testimony and exhibits, where Cannon's attentive participation was irrelevant to the quality of Burdine's defense." *Id.* I simply cannot agree with the majority's statement that counsel's attentive participation during the admission of evidence against a defendant on trial for capital murder was irrelevant to the quality of Burdine's defense. Additionally, the majority speculates regarding whether some of counsel's silence was attributable to any number of trial strategy considerations. *Id.* at 963. I believe such speculation is

inappropriate because, as recognized by the Second Circuit, "the buried assumption in our Strickland cases is that counsel is present and conscious to exercise judgment, calculation and instinct, for better or worse. But that is an assumption we cannot make when counsel is unconscious at critical times." *Tippins v. Walker*, 77 F.3d 682, 687 (2d Cir.1996).

To me, once we have accepted as presumptively correct the state court's finding that counsel slept "during portions of [Burdine's] trial on the merits, in particular during the guilt-innocence phase when the State's solo prosecutor was questioning witnesses and presenting evidence," there is no need to attempt to further scrutinize the record. See *Javor v. United States*, 724 F.2d 831, 834 (9th Cir.1984) (holding that "[w]hen a defendant's attorney is asleep during a substantial portion of his trial, the defendant has not received the legal assistance necessary to defend his interests at trial" and thus, prejudice must be presumed).[7] The factual findings made during Burdine's state habeas proceedings demonstrate that there was a denial of

ner that is peculiar to a person who is in the process of falling asleep; according to all the witnesses, this happened on more than one day of the trial, typically in the afternoon. Two of three jurors ... and the clerk testified that on at least one occasion they watched defense counsel's head actually tilt down to his chest for a significant period of time, which gave the unmistakable impression that he was actually sleeping; Juror Engelhardt and the clerk, Berry, estimated that defense counsel's head rested against his chest for at least 10 minutes on one particular occasion during trial. Berry saw defense ... counsel's head rest against his chest on other occasions shorter than 10 minutes. Both Berry and Juror Davis stated that they continuously watched defense counsel for long periods of time and it was clear that he either was in the process of dozing off or was actually sleeping.

The Court finds the most compelling witness was the former clerk of court, Rose Marie Berry. In addition to being credible and having no motive to misrepresent the truth, Berry had the best opportunity of any participant at trial to observe defense counsel during trial, as her testimony and De-

fense Exhibit # 1A demonstrates, she was approximately 10–12 feet ... from defense counsel. Unlike the trial judge, prosecutor, and jurors, Berry was not required to pay attention to witnesses who were testifying; indeed, from her vantage point, she could not even see the witnesses. Berry adamantly testified that she watched defense counsel continuously during the periods she observed him sleeping.

(footnotes omitted)(brackets in original).

**6.** I would note that simply because counsel orally responded when addressed during trial does not necessarily indicate that he had been awake and attentive immediately prior to the exchange on the record. At the 1995 state habeas evidentiary hearing, two witnesses testified that, on different occasions during trial, counsel was awakened when the trial court or the prosecutor addressed him. Also, on occasion, Cannon's response was somewhat delayed because he had been asleep immediately prior to being addressed.

**7.** *See also Tippins*, 77 F.3d 682 (presuming prejudice based on evidence that defense counsel was asleep for numerous extended periods during testimony of witnesses).

such significance that it made the adversary process unreliable, and, thus, a presumption of prejudice is warranted.[8] Thus, based on the state court's findings that have been accepted by all as presumptively correct, I would affirm the district court's grant of federal habeas corpus relief, vacate the capital murder conviction, and allow the State to retry Burdine.

8. As the majority provides, the State's claim that the district court's application of a presumption of prejudice conflicts with *Brecht v. Abrahamson,* 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), is without merit. *See Hughes v. Booker,* 220 F.3d 346, 353 (5th Cir.2000) (explaining that once we determine that defendant has been constructively denied counsel, any harmless error analysis is unnecessary).